IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

VISION BANK,                             )
                                         )
      Plaintiff,                         )
                                         )
v.                                       )        CIVIL ACTION NO. 10-00172-N
                                         )
ALGERNON LAND COMPANY, L.L.C.,           )
and JAMES RAYFIELD, JR.,                 )
                                         )
      Defendants.                        )

ORDER

     This action is before the Court on cross-motions for summary judgment filed

respectively by James Rayfield, Jr., a defendant herein, (docs. 69-70), and by Vision

Bank, the plaintiff (docs. 73-75).  This action has been referred to the undersigned

Magistrate Judge to conduct all proceedings and order the entry of judgment in

accordance with 28 U.S.C. § 636(c) and Fed. R.Civ.P. 73 (doc. 22) and pursuant to the

consent of the parties (doc. 21).   Oral arguments on the cross motions were held before

the undersigned on March 31, 2011.  Present at the hearing were Allen E. Graham, Esq.

and Ashley E. Swink, counsel for Vision Bank; Jule R. Herbert , Jr., counsel for

Algernon Land Company, L.L.C. and *pro se* [with respect to the third party claims

asserted against him by Rayfield]; and Jim L. DeBardelaben , counsel for James Rayfield,

Jr.  Upon consideration of these motions, the parties' respective   responses in opposition

thereto (docs. 82, 83, 84-85)[1], replies (docs. 92, 93), and all other pertinent portions of the

---

[1] Algernon Land Company, L.L.C., has filed no opposition to Vision Bank's motion for
summary judgment against it and has not sought an extension of the deadline of March 3, 2011,
within which to do so as set forth in the Court's Order of February 11, 2011 (doc. 76).

record, as well as the arguments of counsel presented on the record at the hearing, the undersigned concludes that plaintiff's motion for summary judgment be **GRANTED** with leave to prove damages, and that defendant, Rayfield's motion for summary judgment be **DENIED**.

BACKGROUND

On April 13, 2010, Vision Bank filed an action against Algernon Land Company, LLC ("Algernon") and James Rayfield, Jr. ("Rayfield"), seeking to collect on a defaulted loan established with the execution of a Multipurpose Note and Security Agreement (the "Note") and guaranteed by Rayfield's execution of a Continuing Guaranty ("Guaranty"). Specifically, Vision Bank alleges that Rayfield signed a Guaranty on a Multipurpose Note and Security Agreement and the loan is in default. Vision Bank alleges that Rayfield is in breach of the contract by failing to pay the defaulted loan which, at the time the Complaint was filed, amounted to " <u>$1,445,544.99</u> in principle, interest and late fees through April 12, 2010."  (Doc. 1 at ¶ 22, emphasis in original).  In its Complaint, Vision Bank further states that "[i]nterest accrues at a per diem rate of $599.12."  (*Id*. at ¶ 23). In an affidavit submitted by Vision Bank in support of its motion for summary judgment, Vision Bank now contends:

> As of February 11, 2011, the Bank is owed a total of . . . $1,650,793.32. . ., such total consisting of a balance of $1,217,948.71, $424,256.17 in interest, and $8,588.44 in late charges.  Interest continues to accrue at a per diem rate of $608.974355.

(Doc. 74-1 at 3).

On May 4, 2010, Rayfield filed an Answer and Counterclaim against Vision Bank and a Third Party Claim against Algernon and Jule R. Herbert ("Herbert").  On May 13,

2010, Algernon filed an Answer to the original Complaint filed by Vision Bank. On June 6, 2010, Herbert/Algernon filed an Answer to Rayfield's Third Party Claim.

On February 10, 2011, Rayfield filed his Motion for summary judgment (doc. 69-70) asserting that, because he "was induced into signing a Multipurpose Note and Security Agreement and a Continuing Guaranty based on false and fraudulent representation by Vision and Algernon/Herbert," the Guaranty should be declared void and judgment should be entered in his favor on all claims against him. (Doc. 70 at 14). Rayfield also seeks judgment in his favor on "his claim against Vision and Herbert/Algernon." (*Id*.).

On February 11, 2011, Vision Bank filed its motion for summary judgment (docs. 73-75) asserting that it is "entitled to summary judgment on its Complaint against Algernon and Rayfield, and also on the counterclaims asserted against the Bank by Rayfield in his Second Amended Complaint and Third Party Claim." (Doc. 75 at 2). Vision Bank specifically argues that "Algernon has defaulted under the Note for failure to pay timely, and Rayfield has failed and/or refused to satisfy his obligations now due and owing under the Continuing Guaranty." (*Id*.) Vision Bank also argues that the contracts at issue are valid and enforceable as to both Algernon and Rayfield and "there is no genuine issue of fact as to the existence of a valid contract binding the parties." (*Id*. at 8).

Algernon and Herbert filed a response (doc. 83) in opposition to Rayfield's motion for summary judgment on March 3, 2011. However, Algernon has filed no opposition to Vision Bank's motion for summary judgment, and has not sought an extension of time within which to file any such opposition. Algernon, therefore, does not contest the

validity of the contract at issue in this litigation or Vision Bank's allegation of default and entitlement to damages and judgment in its favor.

## FINDINGS OF FACT

Upon consideration of all the evidence of record, both documentary and testimonial, the undersigned finds that the following facts are either undisputed or uncontroverted by any opposing party:

1.      In or around March 2006, James Rayfield, Jr., doing business as, Raywind Construction, entered into an oral agreement to build a custom built home for Jule R. Herbert, Jr. at 27102 Safe Harbor Drive, Orange Beach, Alabama 36561.  (Doc. 44 at ¶ 5;  Doc. 44-1).  The actual listed owner of the property was Algernon Land Company, LLC, which was fully owned by Jule R. Herbert, Jr.  (Doc. 44-1).

2.      The original cost estimate by Rayfield to construct the Herbert residence on Safe Harbor Drive in Orange Beach, Alabama was $655,829.00 (Doc. 53-1 at 1).  After certain additions and changes made by Mr. Herbert, the cost estimate was later revised to $777,823.00 (Doc. 53-1 at 2).  Rayfield started construction on the house in April 2006. *See* Doc. 70-1.  A certificate of occupancy was issued on June 22, 2007.  (Doc. 53-1 at 4).

3.      On June 21, 2007, Rayfield presented Herbert/Algernon an invoice totaling $169,469.36 and, when this invoice was not paid, Rayfield presented Herbert/Algernon on or about July 21, 2007, with an invoice totaling $171,138.57. (Doc. 53-1 at 7-8).  By letter dated August 8, 2007 and forwarded to Herbert, Rayfield informed Herbert of his intention of filing a lien against the Safe Harbor house for $171,138.57. (Doc. 53-1 at 5).

4.      On August 20, 2007, Rayfield filed a Verified Statement of Lien in the office of the Probate Court of Baldwin County on the Safe Harbor Drive house in the

amount of $171,958.57. (Doc. 9-1). By certified letters dated August 20, 2007,

notification of the lien was sent to Herbert (doc. 70-3 at 3) and to Vision Bank (doc. 70-3

at 4).

5.      On November 21, 2007, Algernon entered into a Multipurpose Note and

Security Agreement with the Bank in the original principal amount of One Million, One

Hundred Ninety-Seven Thousand Three Hundred Ninety-Eight and 50/100 Dollars

($1,197,398.50) (the "Note") which is identified as Loan Number 300619. (Doc. 1-1)[2].

Jule R. Herbert, Jr. signed this Note as both the Managing Member of Algernon and, in

his individual capacity,  as a personal guarantor on the Note. (*Id*.)  The Note itself was

set to mature on November 21, 2010. *Id*.  The stated purpose of this loan is to

"REFINANCE CONSTRUCTION LOAN." *Id.*

6.      Rayfield is not listed as a "borrower" anywhere on the Note or the

Amendment to the Note. (Docs. 1-1 and 1-2).  On the last page of the Note, however,

Rayfield signed his name in his individual capacity under the section entitled

"GUARANTEE." (Doc. 1-1 at 3).  In his individual capacity, Rayfield also executed a

separate "Continuing Guaranty" in favor of Vision Bank (the "Continuing Guaranty").

(Doc. 1-2).

7.      Rayfield argues that the purpose of the November 21, 2007 loan was not to

refinance construction loans but was, instead, "a renewal of  . . . the new loan [Loan

Number xx0187] used to pay off the two construction loans." (Doc. 70 at 8).  Rayfield's

---

[2] This loan is also identified as "Loan Number xx0619."  (Doc. 70 at 8).

fraud claim is predicated solely on this alleged misrepresentation.[3] Rayfield has simply mischaracterized the documents at issue.    The Note for $1,025,000.00 entered into by Algernon on August 23, 2007 and identified as Loan Number xx 0187 was a "renewal" of the two construction loans identified as 95133 and 101311 and thus confirms its stated purpose, namely the "Refinance of construction loans." (Doc. 70-3 at 5-7).[4] Rayfield himself contends that "after the $1,025,000.00 term loan was made, the issue of Rayfield's lien came up" (doc. 70 at 7), a lien for unpaid *construction costs* in the amount of **$171, 958.57** (doc. 9-1).  Rayfield later confirms that "Herbert/Algernon entered into an Accommodation Mortgage and Security Agreement with Vision Bank for $172,398.50 [doc. 70-3 at 11-17] [and] [a]pparently, this represented the funds required to pay off  Rayfield's lien." (Doc. 70 at 7-8).[5] It is, therefore, apparent that the November 21, 2007 loan in the amount of $1,197,398.50 is indeed a "renewal" of the August 23, 2007 loan identified as Loan Number xx 0187 for $1,025,000.00 to which has been added the sum of $172,398.50 set forth in the Accommodation Mortgage and Security Agreement and that both represent construction loans given to Algernon for the

---

[3] Rayfield argues that, pursuant to Loan #300187 (the $1,025,000.00 loan executed by Algernon on August 23, 2007), "Vision Bank received a disbursement of funds for Loan #187 in the amount of $899,900.00 to pay off Algernon Land Company, LLC Loan #96133(the original $900,000.00 construction loan) and $125,000.00 to pay off Loan #101311, the $125,000.00 additional construction loan [and thus] [b]y August 23, 2007, all construction loans for construction of the house located on Lt 7, Safe Harbor Subdivision, were paid in full."  Second Amended Complaint and Third Party Claim (Doc.53) at ¶ 24.  Inasmuch as Vision Bank was simply consolidating and renewing construction loans into Loan #300187, there was no disbursement of funds at the closing of that loan.  The only disbursement of funds by Vision Bank was made to Rayfield at the closing of the November 21, 2007 Loan #3009619 when Rayfields lien "was satisfied by a draft on Vision Bank in the amount of $172,398.50." (*Id.* at ¶ 26).

[4] The term of this loan was from August 13, 2007, to August 13, 2010.  (Doc. 70-3 at 5).

[5] *See also* Rayfield's testimony that the sum added to the $171,958.57 lien was "interest" . . . added to make up the difference."  (Doc. 74-2 at 15).

construction of the Herbert residence on Safe Harbor Drive in Orange Beach, Alabama.[6]

The documents thus confirm that their purpose was indeed to "REFINANCE

CONSTRUCTION LOAN." (Docs. 1-1 at 1, 70-3 at 5).

   8.   Rayfield concedes that, "[o]n November 21, 2007, Rayfield signed a

Continuing Guaranty Agreement with Vision Bank, guaranteeing payment of Loan

Number xx0619." (Doc. 1-1). Rayfield does not dispute that the Continuing Guaranty

Agreement contains the following provision:

> 3. ABSOLUTE AND CONTINUING NATURE OF GUARANTY.
> Guarantor's Obligations are absolute and continuing and shall not be
> affected or impaired if Lender repeatedly and unconditionally amends,
> renews, extends, compromises, exchanges, fails to exercise, or perfects
> rights in, impairs or releases any collateral or any of the indebtedness owed
> by any Borrower, co-guarantor, or any third party (even if such impairs
> Guarantor's right of subrogation) or any of Lender's rights against any
> Borrower, co-guarantor, third party or collateral. In addition, the
> Obligations shall not be affected or impaired by the discharge (including,
> but not limited to, any inability to collect a deficiency judgment against
> Borrower, Guarantor or a third party) death, incompetency, termination,
> dissolution, insolvency, business cessation, or other financial deterioration
> of any Borrower, Guarantor, or third party.

(Doc. 1-2 at ¶ 3). Nor does Rayfield dispute that the following waiver of notice was set

forth in the Continuing Guaranty Agreement:

> 5. WAIVER OF NOTICE. Guarantor hereby waives notice of the
> acceptance of this Guaranty, notice of present and future extensions of
> credit and other financial accommodations by Lender to any Borrower;
> notice of presentment for payment, demand, protest, dishonor, default, and
> nonpayment pertaining to the indebtedness and the Guaranty.

(*Id*. at ¶ 5). (*See also* Doc. 9 at ¶¶ 1 and 16; Doc. 74-2 at 34-36).

---

[6] The addition of $1,025,000.00 and $172,398.50 equals the $1,197,398.50 amount loaned
pursuant to the November 21, 2007 Multipurpose Note and Security Agreement at issue in this litigation.
At oral arguments on March 31, 2011, counsel confirmed that the $172,398.50 figure represented
Rayfield's original lien plus added interest.

9.      Rayfield does not contend, and the record does not support a finding, that he was either prevented from reading, or unable to understand, the Note and the Continuing Guarantee which he signed on November 21, 2007.  Rayfield is a graduate of the University of Alabama, where he was awarded a bachelor of sciences degree in business.  (Doc. 74-2 at 3-4).  Rayfield  has thirty-two years of business experience.  (*Id*. at 79).  Rayfield further testified that he has been involved in commercial real estate building and development off and on since 1984, and has been a member of or otherwise held an ownership interest in at least three closely-held Alabama corporations or limited liability companies.  (*Id*. at 7-9 and 12-13).  Rayfield also testified that, at certain times during the last ten years, he has maintained commercial insurance licenses, and as an insurance agent, had binding authority on homeowner, automobile, life and annuity policies.  (*Id*. at 10-11).  Nonetheless, Rayfield admitted that he never read the Note or the Continuing Guarantee "in its entirety."  (Doc. 74-2 at 47-48).

10.     "On November 21, 2007, Rayfield signed a Continuing Guaranty Agreement with Vision Bank, guaranteeing payment of Loan Number xx0619  [and]  Rayfield received the $172,000.00 plus to pay off  the lien he had filed on the Safe Harbor house."  (Doc. 70 at 8).   Rayfield's lien was specifically "satisfied by a draft on Vision Bank in the amount of $172,398.50."  (Doc. 53 at ¶ 26).

11.     On March 3, 2008, Algeron and Herbert entered into a Limited Forbearance Agreement with Vision Bank by which Algernon and Herbert were required to "use their best efforts to sell parcels of real property described above as Unit 702 of the Colonnades and Lot 171 Ashford Park, Unit 6, as soon as possible . . . at a cash price acceptable to [Vision Bank], in order to pay down the debt owed under the above described promissory

notes and loans [which included Loan Number 300619 in the amount of $1,197,388.50].”
(Doc. 70-3 at 25-30).  This Forbearance Agreement allowed Vision Bank to apply the
proceed of the authorized sale to “one or more of said other promissory notes or loans in
[Vision Bank’s] sole discretion.” (*Id*. at 27).

12.     On June 26, 2008, the Limited Forbearance Agreement executed on March
3, 2008, was extended from June 15, 2008 until December 15, 2008.  (*Id*. at 31).
Similarly, on December 9, 2008, the Limited Forbearance Agreement  was again
extended from December 15, 2008 until June 15, 2009.  (*Id*. at 35).

13.     On August 26, 2009, Vision Bank executed a Partial Release of Recorded
Lien by which it released its lien on a piece of property, namely Lot 171, Ashford Park,
Unit 6, that was security for Loan Number 300619.  (Doc. 70-3 at 39).  This property was
specifically reference in the Limited Forbearance Agreement executed by Algernon and
Herbert with Vision Bank on March 3, 2008.  *See* Finding 11, *supra*.

14.     Two provisions are set forth on the front of the document by which the
signatories to the contract “agree to pay the costs you incur to collect this note in the
event of my default, including your attorney fees”  and agree to “PAY A LATE
CHARGE EQUAL TO 5.000% OF THE PAYMENT AMOUNT OR $5.00
WHICHEVER IS GREATER UP TO $999.99.”  (Doc. 1-1 at 1).  In order to apply to this
contract, these provisions required a checkmark in the space provided but have not been
checked.  (*Id*.).  This unchecked provision regarding collection costs conflicts the the
“ADDITIONAL TERMS OF THE NOTE” on the back page which states:

COLLECTION COSTS AND ATTORNEY'S FEES: If I am in default and you have to sue or take other steps to collect or secure this note, I agree to pay your reasonable costs. If the original amount financed is greater than $300 and if you refer this note to an attorney who is not your salaried employee, I agree that these costs include a reasonable attorney's fee. If this loan is primarily for a consumer's personal, family, or household use, a reasonable attorney's fee will not exceed 15% of the unpaid debt.

(Doc. 1-1 at 3). There is no other provision in the Note which authorizes a late fee other than the unchecked provision on the first page.

15.     Under the Continuing Guaranty, Rayfield  was obligated only  " to pay all of **Borrower's** present and future joint and/or several, direct and indirect, absolute and contingent, express and implied, indebtedness, liabilities, obligations and covenants (cumulatively 'indebtedness') to Lender." (Doc. 1-2 at 1). In a subsection of paragraph 2, Rayfield's guarantee is further "limited to the following described note[]," namely Loan Number 300619, but the subsection checked by Vision Bank does include language indicating that the guarantor's obligation extends to "all interest and all Lender's expenses and costs (including, but not limited to, attorney's fees and other costs incurred by Lender to collect the indebtedness and/or to protect, maintain, or operate any collateral given as security for the indebtedness . . .". (*Id*.). Thus Vision Bank appears to first limit Rayfield's obligations to those of Algernon, the Borrower, and then, in a subsection, to expand Rayfield's obligations. To the extent that such creates an ambiguity that must be resolved against the drafter of the document,   Rayfield is obligated under the Continuing

Guarantee to pay Vision Bank's late fees and collection costs, including attorney's fees, only if Algernon was in fact obligated to pay such fees under the Note.[7]

CONCLUSIONS OF LAW

A.    <u>Summary Judgment Standard</u>.

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  Summary judgment should be granted when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." *See* <u>McDowell v. Brown</u>, 392 F.3d 1283, 1288 (11th Cir. 2004) (*citing* <u>Nolen v. Boca Raton Community. Hosp., Inc.</u>, 373 F.3d 1151, 1154 (11th Cir. 2004) (*citing* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)).

All issues of material fact are first resolved in favor of the movant, followed by a determination of  whether the opposing party is entitled to judgment as a matter of law under that version of the facts.  <u>McDowell</u>, 392 F.3d at 1288 (*citing* <u>Durruthy v. Pastor</u>,

---

[7] The reverse side of the Continuing Guaranty, like the reverse side of the Note, sets forth the following provision under the heading "COLLECTION COSTS":

> If Guarantor is in default and lender has to sue or take other steps to collect or secure the obligations, Guarantor agrees to pay Lender's reasonable costs.  If the Obligations exceed $300 and Lender refers the matter to an attorney who is not a salaried employee of Lender, Guarantor agrees that these costs include a reasonable attorney's fee.  If this Guaranty secures obligations incurred primarily for a consumer's personal, family, or household use, a reasonable Attorney's fee will not exceed 15% of the obligations."

(Doc. 1-2 at 2).  To the extent that such an obligation exceeds the obligations of the Borrower, such would conflict with the language on the face of the Continuing Guaranty by which Guarantor's obligations are clearly limited to the Borrower's obligations.

351 F.3d 1080, 1084 (11th Cir. 2003). There exists no genuine issue of material fact, and summary judgment is due to be granted, when "the evidence could not lead a rational fact-finder to find for the nonmoving party, and where the nonmoving party fails to make a sufficient showing to demonstrate an element essential to that party's case, on which that party bears the burden of proof at trial." McDowell, 392 F.3d at 1288-89 (*citing* Celetex Corp. v. Catrett, 477 U.S. at 322-23; and Holbrook v. City of Alpharetta, 112 F.3d 1522, 1525-26 (11th Cir. 1997). "[G]enuine disputes are 'those in which the evidence is such that a reasonable jury could return a verdict for the non-movant [and] [f]or factual issues to be considered genuine, they must have a real basis in the record'." McDowell, 392 F.3d at 1289, *quoting* Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996). *See also* Greenberg v. BellSouth Telecommunications, Inc., 498 F.3d 1258, 1263 (11th Cir. 2007)("There is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor.")(*quoting* Waddell v. Valley Forge Dental Assocs., Inc., 276 F.3d 1275, 1279 (11th Cir. 2001)). In addition, the movant must "go beyond the pleadings and by [his/its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file," establish that genuine issues of material fact exist to be resolved at trial, because movant generally bears the burden of proof at trial. Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324; Freeman v. Town of Eatonville, Fla., 2006 WL 3078928, *2 (11th Cir., November 1, 2006). The Eleventh Circuit has also held that "[w]e view 'the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion'."), *quoting* Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).

Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and, therefore, do not suffice to oppose a motion for summary judgment.  Holifield v. Reno, 115 F.3d 1555, 1564  n.6 (11th Cir. 1997) (plaintiff 's conclusory assertions ..., in the absence of supporting evidence, are insufficient to withstand summary judgment."); Harris v. Ostrout, 65 F.3d  912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); Fullman v. Graddick, 739 F.2d 553, 557 (11th cir. 1984)("mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment...").  Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party.  Celotex, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); Barnes v. Southwest Forest Industries, Inc., 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, it is appropriate to grant summary judgment.).

    B.     Vision Bank's Breach of Contract Claim against Algernon.

It is undisputed that Alabama law governs the substantive issues in this action. Both the Note and the Continuing Guarantee  designate Alabama law as governing the issues (doc. 1-1 at ¶ 13; doc. 1-2 at ¶ 20), and the parties acknowledge same (doc. 70 at 13; doc. 75 at 8).

Under Alabama law, a plaintiff must prove the following elements to prevail on a breach of contract claim: (1) the existence of a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages. Wachovia Bank, NA v. L&H Investments, LLC, 2010 WL 3825572, *4 (M.D. Ala., Sep. 24, 2010), *citing* Ex parte American Heritage Life Ins. Co., 2010 WL 1170513, *2 (Ala.2010) (*citing* Congress Life Ins. Co. v. Barstow, 799 So.2d 931, 937 (Ala.2001)); Shaffer v. Regions Fin. Corp., 29 So.3d 872, 880 (Ala. 2009) (*quoting* Reynolds Metals Co. v. Hill, 825 So.2d 100, 105 (Ala. 2002). As applied to the case at bar, Vision Bank has established, for the following reasons, that it is entitled to judgment on its claim for breach of contract against Algernon.

First, Algernon has conceded that it executed the Note and the Amendment to the Note. (*Cf.* Doc. 1 at ¶¶ 14-15 and Doc. 20 at ¶¶ 14-15). In addition, as stated above, Algernon does not contest the validity of the Note or its contractual obligations under the Note. Consequently, there is no genuine issue of material fact as the existence of a valid contract between Vision Bank and Algernon, namely the Note.

Second, Algernon has not contended that Vision Bank failed to comply with its obligations under the Note. There is, therefore, no genuine issue of fact concerning whether Vision Bank fully performed under the Note. Third, Algernon has conceded that it breached the terms of the Note by failing to make timely payments. (*Cf.* Doc. 1 at ¶ 25 and Doc. 20 at ¶ 25). In addition, Algernon has not asserted any affirmative defenses as to its nonperformance. (*See* generally Doc. 20).

Finally, Algernon has conceded that Vision Bank has been damaged by Algernon's nonperformance. (*Cf*. Doc. 1 at ¶ 26and Doc. 20 at ¶ 26). As of February 11, 2011, Vision Bank contends that it was owed a total of One Million, Six Hundred Fifty Thousand, Seven Hundred Ninety-Three Dollars and Thirty-Two Cents ($1,650,793.32) in regards to the Note. According to Vision Bank, "[t]his total amounts consists of a balance in the amount of $1,217,948.71, interest in the amount of $424,256.17 and $8,588.44 in late charges [and] [i]nterest continues to accrue at a per diem rate of $608.97." (Doc. 75 at 9). Vision Bank is, therefore, entitled to a judgment in its favor against Algernon for breach of contract. The amount of the damages which Vision Bank is entitled to be awarded will be discussed below.

C.     Vision Bank's Breach of Contract Claim against Rayfield.

"Every suit on a guaranty agreement requires proof of the existence of the guaranty contract, default on the underlying contract by the debtor, and nonpayment of the amount due from the guarantor under the terms of the guaranty." Delro Indus., Inc. v. Evans, 514 So.2d 976, 979 (Ala. 1987). "[T]o recover under a ... continuing guaranty, an additional element, notice to the guarantor of the debtor's default, must be proved." Delro Industries, 514 So.2d at 979. It has been held, however, that "[t]he language of the guaranty is controlling in determining whether the holder of the guaranty is under a duty to notify the guarantor of a default by the principal, and notice need not be given when the terms of the guaranty expressly dispense with the need for it." Wells Fargo Bank v. Richard D. Horne, LLC, 2010 WL 5376341, * 3 at n. 1 (S.D.Ala., Dec. 27, 2010), *quoting* Sharer v. Bend Millwork Systems, Inc., 600 So.2d 223, 226 (Ala. 1992)

(applying the rule to a continuing guaranty). *See also* RBC Bank v. CMI Electronics, Inc., 2010 WL 2719096, * 2 (M.D. Ala., July 8, 2010)("In the case of a continuing guaranty, it is also necessary to prove that the guarantor received notice of the debtor's default, unless that right has been waived by the terms of the guaranty contract.").

As to the binding effect of the terms of the guaranty on the guarantor, the Alabama Supreme Court has held:

> The guaranty agreement in this case is an unconditional one. Because the guaranty agreement secures a principal or primary obligation, the liability of the guarantor also depends upon a construction and application of the primary contract. 38 Am.Jur.2d Guaranty § 73 (1968). As the Court of Civil Appeals correctly noted, ***the terms of the guaranty agreement control the obligations of the guarantor***. However, we note that when a contract of guaranty is unconditional and does not limit in any way the obligations of the guarantor, ***the liability of the guarantor will not exceed the liability of the principal debtor.*** 38 Am.Jur.2d Guaranty § 74 (1968). Therefore, ***all guaranty contracts are conditioned upon the principal contract between the creditor and the principal debtor.*** 38 Am.Jur.2d Guaranty § 74 (1968); <u>Northern Indiana Steel Supply Co. v. Chrisman</u>, 139 Ind.App. 27, 204 N.E.2d 668 (1965).
>
> In order to be entitled to enforce the obligation of the contract of guaranty, the creditor must show that the guaranteed debt or obligation is due, and if for any reason the debtor is not bound to make payment to the creditor, then the creditor may not hold the guarantor liable. 38 Am.Jur.2d Guaranty § 77 (1968). Like a surety, a guarantor is liable only in the event and to the extent that the principal is liable. 38 Am.Jur.2d Guaranty § 77 (1968).

<u>Ex parte Kaschak</u>, 681 So.2d 197, 200 (Ala. 1996)(emphasis added). Furthermore, when a contract is "one of absolute guaranty," as here, "the failure of the principal to pay the debt within the time provided in the principal contract fixed the liability of the guarantors, without regard to the question of the principal's solvency or insolvency, and the plaintiff was under no duty to the guarantors to pursue its remedy against the

principal as a prerequisite to its right to recover against the guarantors." Ehl v. J.R. Watkins Medical Co., 112 So. 426, 426 (Ala. 1927); s*ee also* In re Waters, 8 B.R. 163, 167 (Bkrtcy. N.D. Ga. 1981) ("Generally, for a guarantor to become liable under a guarantee of payment there need only be a failure of the primary obligor to make payment"); In re Southern Cinemas, Inc., 256 B.R. 520, 527 (Bkrtcy. M.D. Fla. 2000) (held, under Alabama law, that "[i]n order to be entitled to enforce the obligation of the contract of guaranty, the creditor must show that the guaranteed debt or obligation  is due."); *see also* Doc. 1-2, at ¶ 3 and Finding # 8, *supra* (language regarding the absolute nature of the Continuing Guaranty).

In this case, each of these elements is met.  Rayfield does not dispute his execution of the Continuing Guaranty.  (Doc. 74-2 at 34-36;  Doc. 9, ¶¶ 1, 16).  Further, it is undisputed that the borrower (Algernon) is in default under the terms of the Note and that neither Algernon nor Rayfield has satisfied their obligations of payment following Algernon's default.  (Doc. 74-1 at 3).  Although Vision Bank did not inform Rayfield of the default or demand payment on the guaranty until March 24, 2010 (doc. 1-4 at 1), it is undisputed that Rayfield specifically waived  his right to notice in Paragraph 5 of the Continuing Guaranty.  (Doc. 1-2 at 2; Finding # 8, *supra*).

Vision Bank is, therefore, entitled to a judgment as a matter of law in its favor against Rayfield for breach of contract.  The amount of the damages which Vision Bank is entitled to be awarded will be discussed below.

D.     Rayfield's Claims of Fraud in the Inducement.

In Count I (Third Party Claim) and Count II (Counterclaim), Rayfield asserts a fraud in the inducement claims against Herbert and Vision Bank, respectively.  (Doc. 53). In order to prevail on a claim alleging fraud, a plaintiff must establish "(1) [the existence] of a false representation; (2) that the false representation concerned a material existing fact; (3) that the plaintiff relied upon the false representation; and (4) that the plaintiff was damaged as a proximate result of the reliance." Hawk v. Roger Watts Ins. Agency, 989 So.2d 584, 589 ( Ala.Civ.App. 2008), *quoting* Harrington v. Johnson-Rast & Hays Co., 577 So.2d 437, 439 (Ala. 1991).  As to the critical element of reasonable reliance, the Alabama Supreme Court, in Foremost Ins. Co. v. Parham, 693 So.2d 409 (Ala. 1997), overruled the "justifiable reliance" standard adopted in Hickox v. Stover, 551 So.2d 259 (Ala. 1989), and returned to the "reasonable reliance" standard which previously governed.   Foremost, 693 So.2d at 421.  The Alabama Supreme Court thus rejected the "justifiable reliance" standard because it "eliminated the general duty on the part of a person to read the documents received in connection with a particular transaction (consumer or commercial)."  (*Id*.)  The "reasonable reliance" standard was held not only to provide "a more practicable standard that will allow the factfinder greater flexibility in determining the issue of reliance based on all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties" but to provide "a mechanism . . . whereby the trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but

nonetheless made a deliberate decision to ignore written contract terms." (*Id*.)  More

recently, the Alabama Supreme Court has emphasized that:

> [T]he burden is on the party alleging fraud to prove by substantial evidence
> the element of reliance. <u>Allstate Ins. Co. v. Eskridge</u>, 823 So.2d 1254, 1264
> (Ala. 2001). "Substantial evidence is evidence of such weight and quality
> that fair-minded persons in the exercise of impartial judgment can
> reasonably infer the existence of the fact sought to be proved." <u>West v.</u>
> <u>Founders Life Assurance Co. of Florida</u>, 547 So.2d 870, 871 (Ala. 1989).
> *See also* § 12-21-12, Ala.Code 1975; <u>Thomas v. Principal Fin. Group</u>, 566
> So.2d 735, 738 (Ala. 1990). Evidence that amounts to "mere speculation,
> conjecture, or guess" does not rise to the level of substantial evidence.
> Charles W. Gamble, McElroy's Alabama Evidence § 448.01 (1991) (*citing*
> <u>Smoyer v. Birmingham Area Chamber of Commerce,</u> 517 So.2d 585 (Ala.
> 1987), and <u>Sprayberry v. First Nat'l Bank</u>, 465 So.2d 1111 (Ala. 1984)).

<u>Hunt Petroleum Corp. v. State</u>, 901 So.2d 1, * 4 (Ala., 2004).  *See also* <u>Wright Therapy v.</u>

<u>Blue Cross,</u> 991 So.2d 701, 706 (Ala. 2008)("Under the ['reasonable-reliance'] standard,

a person cannot blindly rely on an agent's oral representations to the exclusion of written

disclosures in a contract.")(*quoting*  <u>Harold Allen's Mobile Home Factory Outlet, Inc. v.</u>

<u>Early</u>, 776 So.2d 777, 783-84 (Ala. 2000));  <u>Oakwood Mobile Homes, Inc. v. Barger</u>,

773 So.2d 454, 461 (Ala. 2000)(rejected defendant's contention that he relied on agent's

statement that the document he was signing was merely  "for insurance purposes"

because "[a]ny falsity . . . is apparent on the face of the document itself [and defendant]

did not state in his affidavit that he cannot read or [the agent] prevented him from reading

the documents he signed.").

In this case, Rayfield's contention regarding the precise misrepresentation upon

which his fraud claim is premised is not entirely clear.  In his initial counterclaim,

Rayfield  alleged that he was told by the Bank (through Josh Mims) that he was signing

"short term guarantee in order for Rayfield to receive his funds and Herbert could receive

the permanent financing for his residence [which] should be in place within three to four months." (Doc. 9 at ¶ 15). In his First Amended Answer to Original Complaint, Counterclaim, and Third Party Claim (doc. 44), Rayfield alleges that he spoke with Mims on the telephone "before the November 21, 2007 closing" and Mims informed him that "[i]n order to refinance the construction loan so [Rayfield's] lien could be paid, Rayfield, as the contractor, had to guarantee the construction loan. . .[which] would only be three (3) or four (4) months in order for the paperwork to be completed on the permanent loan, which was already approved." (Doc. 44 at ¶ 15). In his Second Amended [Counterclaim], and Third Party Claim (doc. 53), Rayfield described the alleged misrepresentation as follows:

> . . .Prior to the closing it was represented to Rayfield by both Vision Bank through employee Joshua Mims and by Jule Herbert that permanent financing was in place for the residence. Rayfield was informed that until the lien was satisfied, permanent financing could not take place. Rayfield was informed that in order to obtain a Refinance Construction Loan of $1,197,398.00, that Rayfield would need to guarantee the loan as a formality, and that permanent financing was already approved and in place. Based upon the representation by Vision Bank that permanent financing was approved and in place, and the representation of Herbert, who was Rayfield's attorney, Rayfield signed the Multipurpose Note and Security Agreement that was presented to him at closing, which represented to Rayfield that the purpose of the loan was to "refinance construction loan." However, the construction loans had been paid off on or about August 23, 2007. The loan paid off by the funds generated by the loan Rayfield guaranteed was not the construction loan, but a three year loan agreement signed on August 23, 2007.

(Doc. 53 at ¶ 26). Rayfield also argues that "[Mims] and Herbert/Algernon misrepresented the reason for the loan he guaranteed." (Doc. 70 at 12). Rayfield cites to his own deposition testimony to assert that "he had been told that in order for him to get paid [on his construction lien] that the construction loan would have to be refinanced and

then Algernon/Herbert would be able to obtain a permanent loan." (Doc. 82 at 6, *citing* Doc. 74-2 at 69-71). Rayfield also not only confirmed that he "felt like [signing the guaranty] was the only way [he] could get [his] lien money as opposed to going through the court system" but that such would "at the same time prevent Mr. Herbert from losing his home, and cause Vision Bank not to have to go through a whole lot of legal expense." (Doc. 74-2 at 75).[8]

It is, however, undisputed that the Note (Loan No. 300619) specifically states that it is a loan in the amount of $1,197,398.50 for a term of three years from November 21, 2007, which is the "funding date" (also the date of execution of the Note and the Guaranty) and that the "maturity date" is November 21, 2010. The evidence of record also establishes that the Note represents not only a renewal of Loan No. 300187, which itself was the renewal of two construction loans identified as 95133 and 101311, but an incorporation of an Accommodation Mortgage and Security Agreement between Vision Bank and Algernon for $172,398.50, which represents the amount required to pay off Rayfield's lien for unpaid construction costs. *See* Finding # 7, *supra*.

The Continuing Guaranty executed by Rayfield specifically and clearly references the Note and its three year maturity date on the front page, namely :

---

[8] Rayfield also testified in this manner:

The Guaranty was based upon the fact that I had no desire to drag Mr. Herbert into the courtroom and take his house away from him for one hundred and seventy-two thousand dollars, which the bank would have had to have paid me since they already had invested one point - - one million and twenty-five thousand, and I'm sure the bank would have bought the house in. And I needed my money as quickly as I could get it because I was in the process of doing a development."

(Doc. 74-2 at 49).

| INTEREST RATE | PRINCIPAL AMOUNT/ CREDIT LIMIT | FUNDING DATE | MATURITY DATE | CUSTOMER NUMBER | LOAN NUMBER |
|---|---|---|---|---|---|
| 7.500 | 1,197,398.50 | 11/21/2007 | 11/21/2010 | | 300619 |

(Doc. 1-2; Doc. 75 at ¶ 6). The front page is also replete with warnings regarding the "unlimited" liabilities and obligations Rayfield was assuming under this agreement, as well as cautioning the signer about the importance of reading the document before signing it. (Doc. 1-2). The Continuing Guaranty specifically provides that "[Rayfield's] Obligations under this Guaranty are direct and unconditional and may be enforced without requiring [Vision Bank] to exercise, enforce, or exhaust any right or remedy against any Borrower, co-guarantor, third-party, or collateral." (Doc. 1-2 at ¶ 4). In the Continuing Guaranty, Rayfield also waived his rights to subrogation against Algernon, as the Borrower, and Herbert, as a co-guarantor. (Doc. 1-2 at ¶ 11).[9]

Rayfield's counsel conceded on the record at the hearing on March 31, 2011, that neither Mims nor Herbert were present at the closing when Rayfield signed the Note and the Continuing Guaranty. Rayfield's counsel also argued on the record that Rayfield relied on Herbert's mere signature on the Note. In addition, Rayfield, himself, conceded that he did not read the Guaranty "in its entirety" even though no one prevented him from reading it. (Doc. 74-2 at 47-48). Rayfield essentially argues simply that it did not matter

---

[9] The Continuing Guaranty specifically provides: "Guarantor hereby irrevocably waives and releases the Borrower from all "claims" . . . to which Guarantor is or would, at any time, be entitled by virtue of its obligations under this Guaranty, including, without limitation, any right of subrogation (whether contractual, under Section 509 of the Bankruptcy Code or otherwise), reimbursement, contribution, exoneration or similar right against the Borrower, any co-guarantor or any collateral." (Doc. 1-1 at ¶ 11).

what the document said, he was relying on the representations of Mims and Herbert to the contrary that it was a short-term loan.

Under these circumstances, Rayfield cannot contend that he reasonably relied on any contrary representation he alleges was made by either Mims or Herbert. Rayfield has failed to establish that he was induced by any fraud to sign the Continuing Guaranty. Rayfield is, therefore, bound by the obligations he assumed when he executed the Continuing Guaranty on November 21, 2007.[10] Consequently, Rayfield is not entitled to judgment in his favor against either Vision Bank or Herbert on his fraud in the inducement claim and his motion for summary judgment on this claim must be denied.

E.     Rayfield's Counterclaims for Negligence and/or Wantonness.

Rayfield  has asserted counterclaims against Vision Bank for "negligence-willful and wanton failure to inspect for purposes of releasing funds" (Count III), "negligent, willful and/or wanton failure to implement standard procedures or guidelines and/or follow established standard procedures or guidelines to preserve security for the loan" (Count IV), and "negligent or reckless making of a loan to Algernon Land Company, LLC" (Count V). Each of these claims challenges Vision Bank's making or administration of the "initial" and/or February 21, 2007 loan(s) to Algernon.

---

[10] Although Rayfield complains that he was not notified of the Limited Forbearance Agreement, the two extensions of that Forbearance Agreement, or the Partial Release of property he contends was security for Loan Number 300619, he clearly waived his right to receive such notice pursuant to paragraph 5 of the Continuing Guaranty Agreement. See Finding 8, supra.

Although Rayfield purports to seek summary judgment "against Vision Bank and Algernon/Herbert" on these claims, he presents no legal support or discussion in his brief beyond a summary of certain payments made by Herbert and the contention that:

> A review of the construction file maintained by Vision Bank on the construction of this house shows there were receipts and backup documentation in the amount of $590,447.74, but Vision Bank allowed $1,025,000.00 to be paid out of the two construction loans. Where are the receipts for the difference?

(Doc. 70 at 10). Rayfield, at the conclusion of his argument regarding fraud, simply states that he "is also entitled to summary judgment on his claim against Vision and Alegernon/Herbert." (*Id*. at 14). This statement is immediately followed by Rayfield's reassertion that he "was induced into signing a Multipurpose Note and Security Agreement and a Continuing Guaranty based on false and fraudulent representation by Vision and Algernon/Herbert." (*Id*.).

Although Rayfield is a guarantor of the Note, he was not a party or otherwise involved with the "initial" loan or the February 21, 2007, loan he describes in Counts III, IV and V at the times these loans were being made or administered. Rayfield has not addressed the contention that, as a non-signatory, he lacks standing to bring claims for negligent administration of a loan or mortgage which was made to the principal, Algernon Land Company, LLC. *See* Dermer v. Miami-Dade County, 599 F.3d 1217, 1220 (11th Cir. 2010)("Standing for Article III purposes requires a plaintiff to provide evidence of an injury in fact, causation and redressibility."). Instead, Rayfield's sole argument is that, for some unspecified reason:

> . . .Vision owes a duty to Rayfield to show that the funds were properly
> used to build the house under construction. Vision owes a duty to ensure
> that the construction funds were actually construction funds and not a
> personal loan used to build a house, and not pay Herbert's personal office
> expenses.
>
> All of the construction funds had been disbursed before the Guaranty
> was signed by Rayfield. In essence, Vision voluntarily assumed the duty to
> ensure the funds were properly disbursed. When Vision represented to
> Rayfield that the loan was for the purpose of refinancing  construction loans
> it in essence represented the funds were properly disbursed. Thus, since
> Vision voluntarily assumed the duty, it is liable to Rayfield if proper
> procedures were not followed.

(Doc. 82 at 10, *citing, without explanation,* <u>Capital Bank v. MVB, Inc.</u>, 644 So.2d 515,

521 (Fla.App., 3 Dist. 1994) and <u>Motorcity of Jacksonville v. Southeast Bank</u>, 83 F.3d

1317 (11th Civ. 1996). The cases relied upon by Rayfield are inapposite and inapplicable

inasmuch as it is undisputed that Alabama law governs the contracts at issue and all

claims arising from same.

For example, in <u>Capital Bank</u>, the Florida District Court of Appeals for the Third

District  ("Florida Appellate Court") addressed the issue of whether a bank owed and

breached a fiduciary duty to its customer.  The Florida Appellate Court held:

> [W]e recognize a fiduciary relationship between a bank and a customer
> where the bank knows or has reason to know of the customer's trust and
> confidence under circumstances exceeding an ordinary commercial
> transaction. . . . Where the lender has voluntarily assumed additional roles,
> accompanying responsibilities properly follow.

644 So.2d at 521 (internal citations omitted).   Rayfield has proffered no evidence, and

does not even contend, that he was a customer of Vision Bank prior to the execution of

the guaranty. In point of fact, Rayfield testified that he never talked to the bank "until they asked for my tax returns and my financial statements." (Doc. 74-2 at 26).[11]

Similarly, <u>Motorcity</u> does not support Rayfield's claims. Although Rayfield has given no indication of what aspect of the <u>Motorcity</u> case he relies upon, the context in which he offers that citation indicates that he is relying upon the discussion of the "fiduciary duty claim" asserted in that case. However, in <u>Motorcity</u>, the Eleventh Circuit applied Florida law and simply held that:

> In order to establish a fiduciary relationship, there must be an allegation of dependency by one party and a voluntary assumption of a duty by the other party to advise, counsel, and protect the weaker party. <u>Cripe v. Atlantic First Nat'l Bank</u>, 422 So.2d 820 (Fla. 1982); <u>Willis v. Fowler</u>, 102 Fla. 35, 136 So. 358 (1931); <u>Quinn v. Phipps</u>, 93 Fla. 805, 113 So. 419 (1927); <u>Watkins [v. NCNB Nat. Bank of Florida, N.A.</u>, 622 So.2d 1063, 1065 (Fla.App., 1993)]. Stated differently, "the fact that one party places its trust in the other does not create a confidential relationship in the absence of some recognition, acceptance, or undertaking of the duties of a fiduciary on the part of the other party." <u>Bankest Imports, Inc. v. ISCA Corp.</u>, 717 F.Supp. 1537, 1541 (S.D.Fla.1989) (*citing* <u>Harris v. Zeuch</u>, 103 Fla. 183, 137 So. 135 (1931)). *See also* <u>Denison State Bank v. Madeira</u>, 230 Kan. 684, 640 P.2d 1235, 1244 (1982) ("[O]ne may not ... unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary.").

83 F.3d at 1339. As applied to the case at bar, Rayfield has proffered no evidence, or even made sufficient allegations to support his attempt to impose a fiduciary relationship on Vision Bank, an entity that under the facts of this case, does not even appear to owe a fiduciary duty to Algernon, its Borrower.

---

[11] Rayfield also testified that he was first contacted by the bank "within three days or so after . . . they received his August 20, 2007 letter advising them of his lien." (Doc. 74-2 at 25). Rayfield contends that Mr. Mims told him "you need to guarantee the loan in order for us to take the lien off the property so that you can get paid and Mr. Herbert can get his financing." (*Id*. at 32).

Under Alabama law, which is controlling in this case, Rayfield fares no better. The Alabama Supreme Court "has explicitly held that there is no good faith contractual cause of action"; i.e., "bad faith is not actionable absent an identifiable breach in the performance of specific terms of the contract." Deerman v. Federal Home Loan Mortg. Corp., 955 F.Supp. 1393, 1403 (N.D. Ala., 1997), *quoting* Lake Martin/Alabama Power Licensee Ass'n v. Alabama Power Co., 601 So.2d 942, 945 (Ala. 1992).

The Alabama Supreme Court has also held that "[w]hile the relationship between a bank and its customer has been traditionally viewed by courts as a creditor-debtor relationship which does not impose a fiduciary duty of disclosure on the bank, a fiduciary duty may, nevertheless arise when the customer reposes trust in a bank and relies on the bank for financial advice, or in other special circumstances." Bank of Red Bay v. King, 482 So.2d 274, 285 (Ala., 1985). The Alabama Supreme Court concluded, however, that the customer in Bank of Red Bay failed to establish that any special circumstances gave rise to a duty to disclose because, "[w]hen both parties are intelligent and fully capable of taking care of themselves and dealing at arm's length, with no confidential relations, no duty to disclose exists when information is not requested, and mere silence is then not a fraud." (*Id*., *citing* Mudd v. Lanier, 247 Ala. 363, 377, 24 So.2d 550, 562 (1945). The Court emphasized that "[t]here must be active concealment or misrepresentation." (*Id*.). *See also* RNH, Inc. v. Beatty, 571 So.2d 1039, 1042 (Ala. 1990)("a duty to disclose exists in circumstances where parties are not dealing at arm's length."). *Cf.* Cedar Heights Plantation v. Niagara Portfolio Corp., 661 So.2d 230, 231-32 (Ala. 1995)( held that the defendants did not breach any duty to exercise fairness and good faith in refusing to make the terms of the mortgage more lenient in order to help the plaintiffs avoid a foreclosure).

The cases relied upon by Vision Bank are not inconsistent with Alabama law. For instance, in Bank Leumi Trust Co. of New York v. Block 3102 Corp., 180 A.D. 2d 588 (N.Y. App. Div. 1992), the New York Appellate Court noted:

> The language of the guarantees specifies that they are absolute and unconditional, negating the claim of fraudulent inducement (Citibank v Plapinger, 66 NY2d 90, *rearg denied* 67 NY2d 647; Bank Leumi Trust Co. v D'Evori Intl., 163 AD2d 26, 34). A tort action may only be asserted in an action for breach of contract where the underlying agreement gives rise to a duty independent of the contract obligation (Luxonomy Cars v Citibank, 65 AD2d 549, 550; *see*, Megaris Furs v Gimbel Bros., 172 AD2d 209, 210-211). Nor is there a duty of care owed to a guarantor with respect to the alleged negligent administration of an underlying loan (Canterbury Realty & Equip. Corp. v Poughkeepsie Sav. Bank, 135 AD2d 102, 109). The legal relationship between a borrower and a bank is a contractual one of debtor and creditor and does not create a fiduciary relationship between the bank and its borrower or its guarantors. Thus, the court properly dismissed the guarantors" four affirmative defenses and the corporation's second affirmative defense of breach of fiduciary duty.

180 A.D.2d at 589; s*ee also* In re Fordham, 130 B.R. 632, 646 (D. Mass. 1991) ("A lender . . . owes to its borrower or guarantor no duty to use reasonable care to determine that a project is sufficiently feasible to permit repayment of the loan"); Commercial National Bank in Shreveport v. Audubon Meadow Partnership, 566 So.2d 1136, 1139-40 (La. App. 1990) (holding that a lender owes no duty of care to a loan guarantor to determine the feasibility of a project or repayment of the loan).

As stated previously, Rayfield was a guarantor of the November 2007 Note and was not a party or otherwise involved with the "initial" loan or the February 21, 2007 loan he describes in Counts III, IV and V at the times these loans were being made or administered. Rayfield has offered no evidence of, or sufficiently alleged, any special relationship with Vision Bank pursuant to which Vision Bank would be held to owe any duty to Rayfield beyond its obligations which would arise from the guaranty agreement

in this case. Consequently, Vision Bank is entitled to summary judgment in its favor as to the claims set forth in Counts III, IV and V of Rayfield's counterclaim and Rayfield's motion for summary judgment regarding same is due to be denied.

        F.    <u>Rayfield's Third Party Claim against Herbert for Legal Malpractice</u>.

In Count VI of his Second Amended [Counterclaim], and Third Party Claim (doc. 53 at 14-16), Rayfield asserts a claim against Herbert for legal malpractice under the Alabama Legal Services Liability Act, Ala. Code § 6-5-570, et seq. (1975). The facts upon which this claim is predicated are set forth, in pertinent part, as follows:

> 56. Rayfield has had a continuing legal relationship with Jule R. Herbert, Jr. as an attorney from May 2004 through the present time. Rayfield still has funds in escrow with Jule R. Herbert, Jr. the law practice of Jule R. Herbert, Jr. PC. for legal matters.

> 57. Rayfield from May 2004 through March 24, 2010, relied upon Jule R. Herbert, Jr. for legal advice relating to all matters Rayfield was involved in.

> 58. When Rayfield signed the guarantee on the refinance of the construction loan for 27102 Safe Harbor Drive, Lot 7, Orange Beach, Alabama, he relied upon Herbert's representation that a permanent loan was in place and the refinanced construction loan would be satisfied when the lien was released and there was no liability or detriment to Rayfield.

> 59. On November 22, 2007, Rayfield continued his attorney relationship with Herbert and paid Jule R. Herbert, Jr. thirty thousand dollars ($30,000.00) to continue to represent him on all legal matters involving real estate until the funds were expended. (Exhibit 7).

> 60. From May 2004 through March 24, 2010, Herbert had a confidential and fiduciary relationship with Rayfield concerning all legal matters.

> 61. As Rayfield's legal adviser, Herbert had a duty to disclose to Rayfield, Herbert's position and the financial position of Algernon Land Company, LLC prior to Rayfield signing any type of guarantee for Herbert and Algernon Land Company, LLC, which Herbert failed to disclose.

(Doc. 53 at 14).   Rayfield has not proffered any evidence to support his contention that Herbert represented him as counsel with respect to the Continuing Guaranty Agreement and his negotiations with Vision Bank, an allegation which Herbert denies (doc. 83 at 6). Moreover, Rayfield has failed to present any argument in support of this claim in either his initial brief (doc. 70) or his reply (Doc. 92), having chosen instead to argue solely his fraud in the inducement claim.

However, even if Rayfield could establish that Herbert was a legal service provider to Rayfield with respect to the Guaranty at issue in this litigation, he has failed to establish any entitlement to summary judgment in his favor on this claim.  In Free v. Lasseter, 31 So.3d 85 (Ala, 2009), the Alabama Supreme Court held that:

> [T]he sole cause of action against a legal-service provider by that provider's former client is for a " breach of the standard of care," which is defined as " [t]he failure by a legal service provider to comply with the applicable standard of care the breach of which proximately causes the injury or damage[ ] or wrongful death." [Ala. Code] § 6-5-572(4) [(1975)]. *See* Sessions v. Espy, 854 So.2d 515, 522 (Ala. 2002) (common-law tort claims contained in clients' complaint against their former legal counsel, including (1) "breach of a legal duty," (2) "misrepresentation," (3) "suppression," and (4) "negligence," were precluded by the LSLA; the only claim properly asserted was one alleging breach of the duty defined by the LSLA). The "standard of care" is " that level of such reasonable care, skill, and diligence as other similarly situated legal service providers in the same general line of practice in the same general locality ordinarily have and exercise in a like case." § 6-5-572(3)a.

31 So.3d at 89.  The Alabama Supreme Court further held in Free that "[t]he relevant inquiry should not have been whether Free had produced substantial evidence of each element of a fraud claim; the inquiry, instead, should have been whether she could sufficiently demonstrate a breach of the standard of care for a legal-service provider as that standard is defined by § 6-5-572(3) through (4)." (*Id*.)  As was true in Free, Rayfield

has failed to address the proper inquiry regarding his legal malpractice claim against Herbert.

In addition, as a general rule, expert testimony is required to establish deviation from the standard of care in connection with an alleged breach of an attorney's standard of care. Wachovia Bank v. Jones, Morrison & Womanck, P.C., 42 So.3d 667, 681 (Ala., 2009). An exception to this general requirement "occurs where a legal-service provider's want of skill or lack of care is so apparent as to be understood by a layperson and requires only common knowledge and experience to understand it..." (*Id.*) Rayfield has neither provided any expert testimony nor named an expert witness in this regard and has not argue that his claim falls within the exception identified in Wachovia Bank. Consequently, Rayfield has failed to establish that he is entitled to judgment in his favor on this claim and his motion for summary judgment on this claim is due to be denied.[12]

G.     Damages.

In its complaint, Vision Bank contends that it is entitled to receive from Rayfield and Algernon the "indebtedness [of] $1,445,544.99 in principle, interest and late fees through April 12, 2010. (Doc. 1 at ¶ 21-22). Vision Bank supports this contention by proffering copies of the Note and Continuing Guaranty as well as its Notice of Default and Demand for Payment (doc. 1-4) in which is demanded "the immediate and final payment of the entire principal balance of $1,198,248.50 and accrued interest in the amount of $226,925.24 as of March 23, 2010" with the warning that "[i]nterest continues

_____

[12] Neither Algernon nor Herbert has filed a dispositive motion in this case. Consequently, Rayfield's third party claims (doc. 53) against Algernon for fraud in the inducement (Count I) and against Herbert for the legal malpractice (Count VI) remain to be adjudicated in this case before a final judgment can be entered.

to accrue in the amount of $599.12 per diem" (doc. 1-4 at ¶ 3);  and March 24, 2010 letter to Rayfield and Algernon (doc. 1-4 at 1).   In the materials submitted in support of its motion for summary judgment, Vision Bank contends that, as of February 11, 2011, it is owed "$1,650,793.32 in regards to the Note and Continuing Guaranty [which] consists of a balance in the amount of $1,217,948.71, interest in the amount of $424,256.17 and $8,588.44 in late charges [and that] [i]nterest continues to accrue at a per diem (daily) rate of $608.97." (Doc. 75 at ¶ 13; *see also* Doc. 74-1 at ¶ 4).  Although Rayfield has not specifically challenged Vision Bank's calculation of the amount due on the Note pursuant to the Continuing Guaranty, the Court finds that  Vision Bank has failed to establish its entitlement to the sums it has demanded thus far.  For example, Vision Bank offers no explanation of the basis for its "$8,588.44 in late charges" and how such charges were calculated.  As noted in the Court's findings, there appears to be no provision in the Note which authorizes late fees other than an unchecked provision on the front page of that document.  *See* Finding # 15, *supra*.  In addition, Vision Bank has not explained the discrepancy regarding the "per diem (daily) rate" charged on two separate occasions, i.e. $599.12 versus $608.97.   *Cf*. Doc.  1-4 at ¶ 3 and Doc. 75 at ¶ 13.   *See also* Finding # 16, *supra*.  Vision Bank will be provided an opportunity to supplement the record on these issues.

CONCLUSION

For the reasons stated above, the Court concludes and it is therefore **ORDERED** that Rayfield's motion for summary judgment (docs. 69-70) is due to be and is hereby **DENIED** and Vision Bank's motion for summary judgment (docs. 73-75) is due to be and is hereby **GRANTED** with leave to prove damages.

It is, therefore, **FURTHER ORDERED** as follows:

1.     Vision Bank is to supplement the record by **no later than <u>April 29, 2011</u>** with a written brief and supporting evidence which establishes the specific amount of damages it is entitled to collect under the Note and Continuing Guaranty against Algernon and Rayfield.

2.     Rayfield and Algernon shall respond to Vision Bank's proffer on the issue by **no later than <u>May 13, 2011</u>**.

3.     Vision Bank may reply to the arguments of Algernon and Rayfield by **no later than <u>May 20, 2011</u>**, at which time this matter will be taken under submission.

Finally, it is **ORDERED** that Rayfield **SHOW CAUSE** in writing **no later than April 29, 2011**, why his claims against Algernon and Herbert ought not to be dismissed as a matter of law for the reasons stated in this opinion.[13]  The Pretrial Conference which had been set for April 7, 2011, together with the requirement to file a joint pretrial order, is **CONTINUED** until further order of the Court following resolution of the above issues.

**Done** this   12th  day of April, 2011.


/s/ Katherine P. Nelson
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**

---

[13] The Continuing Guaranty specifically provides: "Guarantor hereby irrevocably waives and releases the Borrower from all "claims" . . . to which Guarantor is or would, at any time, be entitled by virtue of its obligations under this Guaranty, including, without limitation, any right of subrogation (whether contractual, under Section 509 of the Bankruptcy Code or otherwise), reimbursement, contribution, exoneration or similar right against the Borrower, any co-guarantor or any collateral."  (Doc. 1-1 at ¶ 11).